The **PENNROAD CORPORATION** and **Affiliated Companies, Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**Nos. 12597, 12598.**

United States Court of Appeals
Third Circuit.

Argued Oct. 8, 1958.

Decided Nov. 26, 1958.

William R. Spofford, Philadelphia, Pa. (Charles S. Jacobs, Charles I. Thompson, Jr., Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., on the brief), for petitioners.

George Beatty, Dept. of Justice, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Joseph F. Goetten, A. F. Prescott, Thomas N. Chambers, Attys., Dept. of Justice, Washington, D. C., on the brief), for respondent.

Before GOODRICH, McLAUGHLIN and STALEY, Circuit Judges.

STALEY, Circuit Judge.

The sole question presented by these appeals is whether gains realized by the taxpayer on the sale of real estate during the years 1950, 1951, and 1952 are taxable as long-term capital gains or as ordinary income.

The facts, which are set forth in some detail in the opinion of the Tax Court,[1] may be summarized as follows:

The Pennroad Corporation is an investment company registered with the Securities and Exchange Commission as a closed-end management company pursuant to the Investment Company Act of 1940, 15 U.S.C.A. § 80a–1 et seq. During the tax years in question, Pennroad, a Delaware corporation, as the common parent corporation of an affiliated group of companies, filed consolidated income tax returns for itself and its affiliates. Among these affiliates was the Canton Company of Baltimore (Canton), of which the taxpayer owned 99.875 per cent of the outstanding capital stock. In turn, Canton owned 100 per cent of the stock of the Canton Railroad Company and 98.6 per cent of the stock of The Cottman Company.

The real estate sales, the taxability of gains from which are at issue, were made by Canton. Canton was incorporated in 1828 by a Special Act of the Maryland Legislature. Its charter provides that it is "capable in law of purchasing, holding, improving and disposing of property, real, personal or mixed * * * for the purposes herein authorized * * * and generally may do every other act or thing necessary to carry into effect the provisions of this act, and promote the objects and designs of said company." The purposes for which Canton was incorporated are set out in the margin.[2]

1. 1958, 29 T.C. 914.

2. " * * * [T]he improvement * * * of any lands and appurtenances which shall belong to the said company, by laying out into lots, streets, squares, lanes, alleys, and other divisions, any such lands within the vicinity of the city of Baltimore, or near to any navigable water, and erecting, constructing, or making thereon all such wharves, ships, boats and other vessels, workshops, factories, warehouses, stores, dwellings, and such other buildings and improvements as may be found or deemed necessary, ornamental or convenient; and letting, renting, leasing, selling or granting, on conditions, or using any lot or other portion of any of the said lands for agricultural, mining or manufacturing purposes, or any wharf, house, or other building or improvement, to be used by any mechanic or artisan, or other person, whether in the employ of the said company or not, in carrying on any law-

The Canton Railroad, for which Canton procured a charter in 1906, is presently a Class 1 switching railroad under Part I, Section 20 of the Interstate Commerce Act, 49 U.S.C.A. § 20. It performs switching services between the industries located on its right of way, the Baltimore waterfront, and the three trunk lines servicing the city. The Cottman Company is a stevedoring company, control of which was acquired by Canton on July 19, 1950. It performs stevedoring operations for the Canton Railroad and other companies and leases from Canton and Canton Railroad an ore pier, cranes, a conveyor system, and all of the facilities utilized by it in the loading and unloading of ships.

Shortly following its organization in 1828, Canton acquired over 5,000 acres of waterfront real estate in and near Baltimore, Maryland. It thereafter leased, improved, and sold portions of this real estate. In addition, it constructed waterfront facilities, such as docks, wharves, and piers. The parties agree that some, if not all, of the improvements then made were with a view to the continued holding and use of the property improved. On a portion of Canton's property the United States government constructed three or four warehouses during World War I. These buildings were subsequently acquired by Canton and since that time one of its activities has been the leasing of warehouse space for manufacturing and storage purposes.

Over the years, Canton purchased additional parcels of real estate. Some of these purchases were effected in anticipation of a proposed extension to the Canton Railroad, which plan was later abandoned. A number of parcels so acquired were purchased because they were regarded as having strategic locations along the proposed route, such as at highway intersections. Other acquisitions were made periodically for the avowed purpose of filling out or shaping up irregular parcels already held by Canton, so as to make them more attractive to persons in the market for industrial sites.

In keeping with its purposes as set forth in its charter, Canton has been vitally interested in the development of the Port of Baltimore. Efforts have been directed at improving and developing its waterfront property for continued use in its operations, while at the same time selling or marketing other portions of its real estate. Additionally, the interests of the Canton Railroad have been a strong influence on Canton's activities. Since the railroad's construction, Canton has made it a policy to sell property suitable for industrial use to purchasers who would increase the traffic of the railroad. Land not suitable for such purposes due to inaccessibility has not been so restricted, and a large percentage has been sold for residential purposes.

By 1930 Canton retained approximately 1,700 acres of real estate, the rest having been liquidated. Subsequently, it sold real estate at a reasonably steady rate up to and including the taxable years. Canton did not list its property with brokers nor did it employ agents or brokers to dispose of its property. The prices for property were fixed by one of its officers subject to approval by its board of directors, such prices being comparable to what other sellers of similar property were receiving.

Although no "For Sale" signs were posted by Canton, it did, from time to time, prepare and issue brochures and maps describing its operations and available real estate. It also advertised lo-

---

ful trade, business, or manufacture, authorized or permitted by the laws of this State. Provided that in laying off streets, squares, lanes, alleys or other divisions no infringement be made on the plan of the city of Baltimore, as laid out by the Commissioners under the act passed at

December Session 1816 Chapter 209, And Provided also, that the said company and its agent shall in all cases whatsoever be subject to and observe the ordinances of the City of Baltimore within the limits of said City."

cally in magazines, newspapers, and telephone directories. Rather consistently Canton described itself as dealing in "Industrial Real Estate." At times it also indicated that it had large or small tracts available to builders for residential purposes.

During the tax years in question, 1950, 1951, and 1952, thirty-three sales were consummated for an income tax profit of $293,949.19.[3] A substantial number of the parcels were from the original acquisition of 5,000 acres; others were acquired as part of the plan to extend the Canton Railroad, and still others or portions thereof were acquired for the purpose of "straightening boundary lines." With the exception of two parcels, all of the land was unimproved and only one-third of the parcels had been rented at any time during the preceding ten years, most of them for outdoor advertising or farming operations at nominal rentals.

For federal income tax purposes, Canton always treated gains from the sales of its real estate as capital gains, and this was not questioned by the government until 1949. Taxpayer's consolidated returns for the tax years in question described Canton's business as "Real Estate—Active." During 1940–1950 the taxpayer stated in its annual reports to its stockholders that "Canton Company of Baltimore was chartered in Maryland in 1829 [sic] for the purpose of dealing in real estate, etc. The principal business is the sale and/or rental of real estate." Canton's annual reports for 1951 and 1952 referred to the land that had been sold as "unimproved land which had been held for many years as an investment." Its annual reports for the

immediately preceding years contained no such statement.

The Tax Court found that "The real estate sold by Canton during the taxable years 1950, 1951 and 1952 was held by it primarily for sale to customers in the ordinary course of its business." It is this finding which taxpayer attacks here. Of course it is in the nature of an ultimate finding of fact and, since such finding is but a legal inference from other facts, this court has held that it is subject to review free of the restraining influence of the "clearly erroneous" rule applicable to ordinary findings of fact made by the trial court. Philber Equipment Corp. v. Commissioner of Internal Revenue, 3 Cir., 1956, 237 F.2d 129; Curtis Co. v. Commissioner of Internal Revenue, 3 Cir., 1956, 232 F.2d 167. However, where the ultimate fact reasonably flows from the basic facts and especially where the basic facts are persuasive of the ultimate fact so found, this court will not disturb the finding of the trial court. Commissioner of Internal Revenue v. Scottish American Investment Co., 1944, 323 U.S. 119, 65 S.Ct. 169, 89 L.Ed. 113; McKelvey v. Commissioner of Internal Revenue, 3 Cir., 1957, 246 F.2d 609. The present case meets this standard.

Taxpayer characterizes Canton's activities as evidencing a gradual, passive liquidation of its original real estate holdings purchased over one hundred years ago. It concludes that the real estate Canton sold during the tax years was either a capital asset under Section 117(a), or property used by it in its trade or business under Section 117 (j) of the Internal Revenue Code of 1939.[4]

---

3. Canton realized a book profit on each of the 33 sales made during the taxable years, but on eleven of the 33 it realized no gain for income tax purposes. Each of the eleven sales on which no income tax gain was realized was of land acquired in 1834, or prior thereto, and presumably the differences between book profit and gain for income tax purposes were due primarily to differences between March 1, 1913, fair market value and cost or some other book basis.

4. "§ 117. Capital gains and losses
  "(a) Definitions. As used in this chapter—
  "(1) Capital assets. The term 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include—
  "(A) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by

That property is being liquidated does not foreclose the question, for as was said in Home Co., Inc., v. Commissioner of Internal Revenue, 10 Cir., 1954, 212 F.2d 637, 641:

> "One may, of course, liquidate a capital asset. To do so it is necessary to sell. The sale may be conducted in the most advantageous manner to the seller and he will not lose the benefits of the capital gain provision of the statute, unless he enters the real estate business and carries on the sale in the manner in which such a business is ordinarily conducted. In that event, the liquidation constitutes a business and sale in the ordinary course of such a business and the preferred tax status is lost."

During the tax years Canton invested the proceeds of the real estate sales in depreciable assets and not in new real estate. This is relied upon by the taxpayer as indicative of the purpose of its operations. In Curtis Co. v. Commissioner of Internal Revenue, 3 Cir., 1956, 232 F.2d 167, that fact was considered among others and led to the conclusion that as to property which had been developed by the Curtis Company as a housing rental business, a true liquidation was being carried forward, but as to the undeveloped parcels there had been no showing of a change in the purpose for which the property was being held— real estate sales. When considered as one of many factors present in this case, the reinvestment facts appear far from determinative. Canton still had considerable real estate for sale and had purchased irregular parcels in the recent past for the purpose of making it more attractive to purchasers. Canton showed no decisive evidence of intention to change the nature of its business or businesses and therefore the Curtis case is inapposite.

In considering Section 117, the Supreme Court has recently stated in Corn Products Refining Co. v. Commissioner of Internal Revenue, 1955, 350 U.S. 46, 52, 76 S.Ct. 20, 24, 100 L.Ed. 29:

> " * * * Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss. The preferential treatment provided by § 117 applies to transactions in property which are not the normal source of business income. It was intended 'to relieve the taxpayer from * * * excessive tax burdens on gains resulting from a conversion of capital investments, and to remove the deterrent effect of those burdens on such conversions.' Burnet v. Harmel, 287 U.S. 103, at page 106, 53 S.Ct. 74, at page 75, [77 L.Ed. 199]. Since this section is an exception from the normal tax requirements of the Internal Revenue Code, the definition of a capital asset must be narrowly applied and its exclusions interpreted broadly. This is necessary to effectuate the basic congressional purpose. This Court has always construed narrowly the term 'capital assets' in § 117."

the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

"(B) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in Section 23(*l*), or real property used in his trade or business;

> \* \* \* \* \*

"(j) Gains and losses from involuntary conversion and from the sale or exchange of certain property used in the trade or business.

"(1) Definition of property used in the trade or business. For the purposes of this subsection, the term 'property used in the trade or business' means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(*l*), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business * * *."

26 U.S.C.A. (I.R.C.1939) § 117(a, j).

Canton not only acquired substantial holdings of real property at or shortly after its incorporation but added to these holdings in later years. The Tax Court was of the opinion that the purpose for which these properties were being held at the time of sale could be discerned from the evidence in the record relative to advertising so as to reach prospective buyers; the purchase of property so as to straighten boundary lines or shape up parcels; the continuity and regularity of sales; and the development of facilities by Canton so as to service industrial establishments it desired to attract to its property held for sale to industries.

The taxpayer's contention that its sales were not conducted in the ordinary course of business since it restricted sales, by and large, to purchasers who would in turn increase the traffic of the Canton Railroad has been adequately answered by the Tax Court. We find nothing in Section 117 which would indicate that sales to a somewhat restricted group of purchasers are not to be considered as sales to customers. The word is to be given its normal meaning and under these facts it is abundantly clear that Canton had "purchasers" or "buyers" for its real estate.

The fact that little, if any, subdividing was carried on by Canton was not considered significant by the Tax Court, and we feel rightly so. In view of the purpose for which it was being held—industrial development—the statement in Stockton Harbor Industrial Co. v. Commissioner of Internal Revenue, 9 Cir., 1954, 216 F.2d 638, 655–656, certiorari denied, 1955, 349 U.S. 904, 75 S.Ct. 581, 99 L.Ed. 1241, appears particularly apt:

"The fact that no subdivision was attempted has no significance. While it is the practice in California and elsewhere to subdivide property held for residential purposes or for mixed residential and business purposes, large industrial sites may derive their chief value from their availability in an undivided and unmapped tract. And it can be seen readily that it might be better business policy to keep a tract of over nine hundred acres, located on an island at Stockton Harbor, ready to satisfy the needs of large industrial plants and allow them to make their own selections, rather than relegate them to choosing from predetermined sites in a subdivided tract. Hence the failure to subdivide and break up the holdings is consistent with the purpose for which the property was held."

The Stockton case brings to the foreground a most important factor that the taxpayer appears to have overlooked. A number of so-called tests or aids in determining whether a business of selling real estate exists were developed in cases dealing with property devoted to residential purposes. Certainly the type and amount of advertising, subdivision, development, solicitation, holding period prior to sale, etc., are decidedly different when dealing with industrial property, as most of the property in the instant case has been characterized.

Two additional points raised by the taxpayer deserve some mention. It has been urged that Canton's income from the sale of real estate was small in comparison with its income from rentals and dividends. This is of little, if any, significance when it is recognized that a company may have more than one business or more than one aspect to its business. Williamson v. Commissioner of Internal Revenue, 4 Cir., 201 F.2d 564, certiorari denied 1953, 345 U.S. 970, 73 S.Ct. 1112, 97 L.Ed. 1387; Friend v. Commissioner of Internal Revenue, 10 Cir., 1952, 198 F.2d 285, 46 A.L.R.2d 761; Fackler v. Commissioner of Internal Revenue, 6 Cir., 1943, 133 F.2d 509. Inasmuch as Canton's sale of real estate was sizeable and not de minimis, we see no merit in this contention.

Lastly, the taxpayer, relying on Chandler v. United States, 7 Cir., 1955, 226 F.2d 403, submits that self-characterization by a party of its activities is not worthy of weight. In the Chandler case the court states at page 406 of 226 F.2d:

"* * * That taxpayer indicated in a 1942 protest to an Inter-

nal Revenue Agent [that], it was a dealer in real property is hardly determinative of the total appeal. Self-description, such as that, in the setting of this case is well wide of the mark and but a speck on the periphery."

There the isolated statement to the Internal Revenue agent was rightly not determinative of the *total appeal*, for, as indicated, the setting of the case must be considered. In the instant case, we have self-characterization in the returns for all three years, similar statements in annual reports for the years 1940 through 1950, advertising of similar purport, and a state of facts that justifies reliance upon these descriptions by the taxpayer of its business. Pacific Homes, Inc., v. United States, 9 Cir., 1956, 230 F.2d 755; White v. Commissioner of Internal Revenue, 5 Cir., 1949, 172 F.2d 629.

Accordingly, since the activities of Canton, culminating in the sales in question, were carried forward with such purpose, system, and continuity, we are persuaded that the sales were to customers in the ordinary course of its business.

The decisions of the Tax Court will be affirmed.