George K. HEEBNER, Jr. and Ruth S. Heebner, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 13173.

United States Court of Appeals
Third Circuit.

Argued May 12, 1960.

Decided June 23, 1960.

On Rehearing July 29, 1960.

George F. Shinehouse, Jr., Philadelphia, Pa. (A. Barnes Zink, Zink, Shinehouse & Holmes, Philadelphia, Pa., on the brief) for petitioners.

William A. Friedlander, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, A. F. Prescott, Attorneys, Department of Justice, Washington, D. C., on the brief), for respondent.

Before GOODRICH, McLAUGHLIN and STALEY, Circuit Judges.

STALEY, Circuit Judge.

This taxpayer's petition for review of a decision of the Tax Court primarily poses the question whether the profit realized on the disposition of certain property was properly treated by the Tax Court as ordinary income rather than capital gain. Two subsidiary issues were also raised in the Tax Court, one relating to an expense deduction and the other to a constructive dividend. The former issue was withdrawn on appeal and the latter need be considered only if it is determined that the Tax Court erred in holding that the profit realized was ordinary income.

The facts may be summarized as follows: George K. Heebner, Jr. and Ruth S. Heebner[1] filed a joint individual income tax return on a cash basis for the calendar year 1953, upon which the Commissioner of Internal Revenue determined a deficiency of $114,372.68. The taxpayer, an architect, was individually engaged in the building and construction business during the years 1951 through 1953. In addition, during the tax year in question, 1953, he was employed as president of George K. Heebner, Incorporated, ("Corporation") organized under Pennsylvania law in 1934 to engage in design and construction of industrial and commercial buildings. Taxpayer owned 89.54 per cent of the Corporation's outstanding stock and the remainder was owned by his two brothers.

Taxpayer was one of a group of builders who early engaged in "package" building. This term has been applied to a builder who not only constructs a building pursuant to the specifications of a customer but also undertakes other facets of the building project, such as design, location of a suitable site, financial arrangements, and delivery of a completed project to the prospective purchaser. Not all projects undertaken by the taxpayer, either individually or through the Corporation were of the package variety, but those that were, were undertaken with the purpose of getting his "foot in the door as a builder." Taxpayer derived substantial taxable income from his individual building operations during the years 1949 to 1953.

In May or June, 1951, two Philadelphia real estate brokers informed taxpayer that Nash-Kelvinator Sales Corporation was desirous of locating offices and a warehouse in the Philadelphia suburban area. Acting upon this information, taxpayer undertook a complicated series of negotiations. Initially he approached the Baltimore and Ohio Railroad in order to acquire a building site adjacent to the railroad's right-of-way in the Sharon Hill, Pennsylvania, section. The title to the property, which the taxpayer subsequently acquired, was held of record by the Schuylkill Improvement Land Company of Philadelphia, a wholly-owned subsidiary of the Baltimore and Ohio Railroad. Contact was also made with Nash-Kelvinator in an attempt to ascertain the desired specifications for the warehouse. More than a month prior to August 30, 1951, tax-

---

1. The relevant facts relate to the property and activities of George K. Heebner, Jr., referred to in the opinion as "taxpayer." His wife, Ruth S. Heebner, is involved in the petition for review only because a joint return was filed.

payer approached the Frankford Trust Company concerning a construction loan and as early as July 13, 1951, contacted Prudential Insurance Company representatives in regard to a proposed sale of the completed premises.

The existence in 1951 of Regulation X promulgated by the Board of Governors of the Federal Reserve System initially presented some difficulties. This regulation limited the amount of any mortgage loan on non-residential real estate to a maximum of 50 per cent of the value of the property. However, this regulation did not apply to short-term construction loans made to a person "other than the owner" of non-residential real estate, provided there was a take-out commitment from a financially responsible institution within the twenty-four month period permitted for construction loans. Since the taxpayer required a mortgage substantially in excess of 50 per cent, he took title to the Sharon Hill site in his individual name and had the construction contract performed by the Corporation. Thereafter, the Corporation, not the taxpayer, could apply for the construction loan in its name and Regulation X would be no hindrance. In considering the application for the loan, however, Frankford Trust Company appeared equally interested in taxpayer's financial stability and required his personal financial statements as well as those of the Corporation.

In short order, taxpayer negotiated the following transactions: In July, 1951, he obtained an option on the building site and on September 5, 1951, the Schuylkill Improvement Land Company agreed to convey the Sharon Hill site to him for $45,000. On September 4, 1951, Frankford Trust Company agreed to make the construction loan in the amount of $600,000 to the Corporation. A preliminary lease was obtained from Nash-Kelvinator in July of 1951 and on August 14, 1951, Nash-Kelvinator committed itself to lease the completed warehouse. Prudential obligated itself in August to purchase the land and building upon completion and confirmed the arrange-

ment on September 11, 1951. Finally, on September 28, 1951, taxpayer entered into an agreement with the Corporation whereby the latter agreed to construct the building, commencing within thirty days of September 28, 1951, the building in no event to cost more than $550,000, including the profit. The commitment of each of the participants with whom taxpayer negotiated was dependent and conditioned upon a commitment of one or more of the other participants; e. g., Frankford Trust Company agreed to make the construction loan to the Corporation only upon condition that Nash-Kelvinator would agree to lease and Prudential would agree to purchase the site and building upon completion.

Taxpayer reported to and obtained the approval of Prudential as regards each significant detail of the supervision and construction of the Sharon Hill project from its inception in May or June, 1951, until final transfer February 15, 1953. The form of agreement to lease, the cost estimate, the specifications, and the settlement sheet were each submitted to Prudential. In addition, following enactment by the Commonwealth of Pennsylvania on December 27, 1951, of legislation, effective February 1, 1952, taxing all real estate transfers at a rate of one per cent, taxpayer entered into negotiations with Prudential concerning it. Initially he proposed that there be "a conveyance immediately by George K. Heebner, Jr., of the ground, with the building in the process of erection." However, following discussion and further correspondence it was agreed that the $6,500 transfer tax would be paid one-half by taxpayer and one-half by Prudential.

On August 1, 1952, Nash-Kelvinator took possession of the warehouse pursuant to its lease with taxpayer and thereafter paid rent to him until February 15, 1953. Subsequently, on January 19, 1953, taxpayer informed Prudential that on or about February 15, 1953, he would tender a deed to Prudential. Prudential inspected the premises and on February

16, 1953, taxpayer conveyed the property to Prudential for the sum of $650,000. The selling price of the ground and building was $650,730.06, less settlement expenses of $10,741.40, for a net figure of $639,988.66 paid to taxpayer.[2]

In its 1953 income tax return, the Corporation reported that it had realized a gross profit of $18,168.24 resulting from construction of the Sharon Hill project. The Commissioner of Internal Revenue determined that under the construction agreement the Corporation had realized a profit of $28,668.24 and allocated a further $10,500 to the Corporation. This was agreed to by the Corporation. However, the Commissioner went further and, recognizing that this additional amount had been paid to the taxpayer at the settlement, treated it as a constructive dividend to the taxpayer.

Taxpayer paid the real estate brokers who first brought the lease possibility to his attention a commission of $21,000. In his 1953 return he deducted $20,650 of this amount as an ordinary expense deduction, but the Commissioner disallowed the deduction and determined that the amount represented an additional cost of the Sharon Hill project. On appeal taxpayer has conceded that the Commissioner is correct as regards this item.

Finally, taxpayer treated the gain from the sale of the property as capital gain. The Commissioner, as previously indicated, took issue with this contention. The Tax Court concluded that "The work performed by [taxpayer] in connection with the development and final disposition of the Sharon Hill project, to-wit, site selection, assistance in design and lease negotiation, financing arrangements, and building construction was in keeping with his regular business operations and the resulting profit in the amount of $193,544.49 was derived from property held by him primarily for sale to customers in the ordinary course of his trade or business." Accordingly, the gain from the transaction was held not to represent proceeds of a capital asset transaction within Section 117(a) (1) (A) of the Internal Revenue Code of 1939.[3]

Taxpayer in his brief makes an elaborate attack on the finding of the Tax Court. However, we need not consider individually each of the five separate arguments, for they are merely varying ways of analyzing the thorny problem posed by the capital gain provisions in light of the specific facts of this appeal.

Initially, we note that the parties appear to disagree as to what the proper scope of our review is in matters of this nature. This is especially significant as regards the Tax Court's finding that the profit "was derived from property held * * * primarily for sale to customers in the ordinary course of his trade or

2. Cost Basis to Taxpayer:

| Item | Cost Basis | Percentage relation of cost of each item to total cost of all items |
|---|---|---|
| Ground | $ 45,899.71 | 10.123% |
| Lease | 21,000.00 | 04.631% |
| Building | 386,487.34 | 85.246% |
| Total Cost | $453,387.05 | 100.00% |

3. "§ 117. Capital gains and losses
"(a) Definitions. As used in this chapter—
"(1) Capital assets. The term 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

"(A) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." 26 U.S.C.A. § 117.

business." As we recently stated in Pennroad Corporation v. Commissioner of Internal Revenue, 3 Cir., 1958, 261 F.2d 325, 328, certiorari denied sub nom. Madison Fund, Inc. v. Commissioner of Internal Revenue, 1959, 359 U.S. 958, 79 S.Ct. 797, 3 L.Ed.2d 766:

> " * * * It is this finding which taxpayer attacks here. Of course it is in the nature of an ultimate finding of fact and, since such finding is but a legal inference from other facts, this court has held that it is subject to review free of the restraining influence of the 'clearly erroneous' rule applicable to ordinary findings of fact made by the trial court. [Citing cases.] However, where the ultimate fact reasonably flows from the basic facts and especially where the basic facts are persuasive of the ultimate fact so found, this court will not disturb the finding of the trial court."

■ Taxpayer contends that he is entitled to capital gain treatment on the profit resulting from the sale of the Sharon Hill warehouse inasmuch as he was not engaged in the business of selling real estate; it was not a sale in the ordinary course of the building business; a sale of real estate "in keeping with" the building business is not a sale in the ordinary course of that business; the gain was not a builder's profit but was derived from a sale; and the transaction was initiated as an investment.

In our consideration of the problem we must be guided by the Supreme Court's recent analysis of Section 117 in Corn Products Refining Co. v. Commissioner of Internal Revenue, 1955, 350 U.S. 46, 52, 76 S.Ct. 20, 24, 100 L.Ed. 29, where it was stated:

> " * * * Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss. The preferential treatment provided by § 117 applies to transactions in property which are not the normal source of business income. It was intended 'to relieve the taxpayer from * * * excessive tax burdens on gains resulting from a conversion of capital investments, and to remove the deterrent effect of those burdens on such conversions.' Burnet v. Harmel, 287 U.S. at page 106 [53 S.Ct. at page 75]. Since this section is an exception from the normal tax requirements of the Internal Revenue Code, the definition of a capital asset must be narrowly applied and its exclusions interpreted broadly. This is necessary to effectuate the basic congressional purpose. This Court has always construed narrowly the term 'capital assets' in § 117."

Heeding this admonition, we recently said in Kaltreider v. Commissioner of Internal Revenue, 3 Cir., 1958, 255 F.2d 833, 838:

> "As to the finding with respect to the nature of taxpayers' business, these principles are well-settled:
>
> " 'There is no fixed formula or rule of thumb' for determining whether property is held primarily for sale to customers in the ordinary course of the taxpayer's business and 'Each case must, in the last analysis, rest upon its own facts.' No single factor or test is dispositive. Factors considered are: (1) the purpose for which the property was acquired; (2) the purpose for which it was held; (3) improvements, and their extent, made to the property by taxpayers; (4) frequency, number and continuity of sales; (5) the extent and substantiality of the transactions; (6) the nature and extent of taxpayer's business; (7) the extent of advertising to promote sales, or the lack of such advertising; and (8) listing of the property for sale directly or through brokers." (Citations omitted.)

In any specific case individual elements become more prominent than others. It does not suffice for taxpayer to vigor-

ously point to the relative infrequency of sales while overlooking other elements. We must look to the general nature of the business and determine whether the profits arose from its everyday operation. Although taxpayer now attempts to minimize the significance of his testimony in the Tax Court, it is clear as regards what has been termed "package building."

"Q. Now, were you among the first contractors in this area to conceive and develop the notion of package building, sir? A. We weren't the first, no, sir.

"Q. I say, were you among the first? A. I can't answer that, because I don't know. I would say that I thought I was first, but I found out years later a lot of other people had been doing it but didn't publicize it or advertise it.

"Q. And about when did you first begin to enter the field of package building, sir? A. When you say package building, I suppose my architectural training and background since I went with my father, in a limited way I was doing package building, but I didn't so advertise it.

"Q. You were doing it but didn't advertise it. What was the nature of package building? A. The package is to take the burden off somebody, some busy executive, trying to have a new building around his operation.

"Q. In other words—let me understand you, sir—you conceive the notion, and it was your business, to get specifications for a company or individual, and to arrange the whole package to the best of your ability— a plot of land, financing, building, and deliver that whole package to the prospective purchaser, or whoever was to have the building. Is that reasonably accurate? A. No, it is not accurate.

"Q. Tell me what is accurate. A. I'll tell you why. You might go out and sell that, but you would only do one out of fifty the package building, but you will get your foot in the door as a builder.

"Q. But at any rate, you did engage in that type of business, package building, didn't you? A. Yes."

Although only one out of fifty projects was of a package nature, he did not deny that he held himself out as a package builder. This was a going aspect of his business, and the Sharon Hill project was but a manifestation of it. Just as in Lakin v. Commissioner of Internal Revenue, 4 Cir., 1957, 249 F.2d 781, and Pennroad Corporation v. Commissioner of Internal Revenue, 3 Cir., 1958, 261 F.2d 325, the sale of real estate was an aspect of the prime business inextricably interwoven for the purpose of furthering the prime or main activity, the sale of real estate here was but one aspect of the entire transaction. There is absolutely no reason for treating the profit from the building transaction here any differently because one small aspect of it involved a sale of land. The land under this factual pattern was merely another commodity, such as lumber, steel and bricks, which went into the finished product, the warehouse and offices for Nash-Kelvinator to be sold to Prudential. In fact there was a condition in the deed from the Schuylkill Improvement Land Company that the taxpayer would construct the warehouse for Nash-Kelvinator upon the site within two years; if he failed to do so, Schuylkill expressly reserved the right to repurchase the site for the $45,000 to be paid by taxpayer.

 It is worthy of note that both taxpayer and Prudential considered that the land was but a small part of this entire transaction. A memorandum to his home office from Joseph M. Russell, Production Manager for Prudential in the Philadelphia area, was admitted by the Tax Court pursuant to 28 U.S.C. § 1732. It related to the request of taxpayer that Prudential assume half the cost of the one per cent transfer tax enacted by the Commonwealth of Penn-

sylvania. Russell recommended that the request be granted and stated:

"This case is subject to this additional tax, which amounts to $6,500, and the seller, George K. Heebner, has asked us if we will assume at least one-half the share of the cost.

"We feel that we should accede to Mr. Heebner's request in view of the fact that this deal was primarily negotiated on our behalf with George K. Heebner, the builder and technically was considered as the seller.

"In reality Mr. Heebner considers he is building the property for us, which is to be occupied by Nash and that he is, in fact, only the temporary owner."

Taxpayer objects to the admission of this document, asserting that Russell would not be permitted to testify in this regard himself and therefore the document is inadmissible. On the contrary, the testimony of Russell would be admissible for the purpose of showing the understanding of Prudential as to the transaction in question, for it is not only taxpayer's intention that is relevant but also the objective facts of the transaction. Further, it would be admissible as an exception to the hearsay rule, as an admission against interest on the part of the taxpayer, for Russell recorded not his idle opinion or reflections but rather a fact, the position presented to him by the taxpayer in support of his request for sharing of the transfer tax. Thus, inasmuch as the testimony would have been admissible, the Federal Business Records Act, 28 U.S.C. § 1732, makes the document admissible.

A study of the facts set forth hereinabove, which are fully supported by the record, clearly indicates that, contrary to taxpayer's assertion, he never initiated the Sharon Hill transaction as an investment. On the contrary, due to the restrictions of Regulation X or for other reasons, it was clear to him that the technical purchase and holding of the real estate in question was merely one step in effectuating the overall transaction. The fact that the taxpayer himself or through controlled corporations has three industrial plants that he leases cannot transmute what was clear on the facts as to the Sharon Hill property. Taxpayer's argument really comes down to this—he would have liked to have held the building for leasing purposes but could not because of the mortgage restrictions imposed by Regulation X. This, however, makes it abundantly clear that from the very beginning the plan as conceived by the taxpayer included, as it had to, the sale of the property upon completion of construction. Thus, although the taxpayer may have had the desire to retain the property as an investment, he at no time had the intention to do so.

All of this, when considered in the light of the Corn Products case, leads ineluctably to the conclusion that here, the profit resulted "from the everyday operation of a business."

The decision of the Tax Court will be affirmed.

## On Rehearing

Before BIGGS, Chief Judge, and GOODRICH, McLAUGHLIN, KALODNER, STALEY, HASTIE and FORMAN, Circuit Judges.

PER CURIAM.

The petition for rehearing filed by the attorneys for the petitioners contains intemperate and gross language. The use of such language by members of the bar in a petition to the court verges upon contemptuous conduct. A repetition of such conduct on the part of counsel will bring disciplinary action. The Clerk will be ordered to strike from the petition the language in question.

The petition will be denied.