FRANK H. TAYLOR & SON, INC., NOTE FIRST NAME, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Frank H. Taylor & Son, Inc. v. Commissioner
Docket No. 599-71.
United States Tax Court
T.C. Memo 1973-82; 1973 Tax Ct. Memo LEXIS 203; 32 T.C.M. (CCH) 362; T.C.M. (RIA) 73082; April 10, 1973, Filed. Bradford P. Colcord and Robert C. Harrison, for the petitioner. Timothy L. Nelson, for the respondent. FEATHERSTONE
MEMORANDUM *204 FINDINGS OF FACT AND OPINION
FEATHERSTON, Judge: Respondent has determined a deficiency of $9,200 in petitioner's income tax for 1966. The sole issue is whether certain unimproved real estate, which petitioner sold at a gain in 1966, was held primarily for sale to customers in the ordinary course of petitioner's business within the meaning of section 1221(1). [1] 2 FINDINGS OF FACT Petitioner is a New Jersey corporation with its principal office in East Orange, New Jersey. It filed its 1966 income tax return with the district director of internal revenue in Newark, New Jersey. Petitioner is a licensed real estate broker. From its incorporation in 1921 through the tax year here in question, petitioner has engaged in multifarious real estate and related business activities, including: (1) buying land, subdividing, building, and selling single-family residences to customers; (2) selling, renting, and managing other persons' residential, commercial, and industrial properties; (3) negotiating mortgage secured loans; (4) appraising real properties; and (5) selling *205 fire, casualty, and life insurance. Prior to the transactions hereinafter described, petitioner had never purchased unimproved land for its own account for either investment or resale. In 1961, petitioner purchased 20 lots in Chatham Township, New Jersey, and immediately began building and selling one-family residences. The success of this pilot project encouraged petitioner to purchase more unimproved land and launch another residential development project on a much larger scale. With this purpose in mind, petitionr 3 approached the executor and trustee of the Estate of Charlotte Butterworth (the estate) who desired to liquidate a 116-acre tract of unimproved land owned by the estate in Morris Township, New Jersey. The 116 acres consisted of five odd-shaped, rectangular tracts strung out on a jagged line running from southwest to northeast. Approximately 20 acres of the most southwesternly portion of the tract (the south lot or the lot) was cut off from the rest of the tract (the north lot) by a two-lane, blacktop road known as Sussex Avenue. The north lot was primarily high, contoured terrain, well treed but rocky, and zoned one-family residential. Good quality homes *206 were already standing on some of the tracts surrounding the north lot. The terrain of the south lot, although essentially similar to that of the north, sloped down from Sussex Avenue at a steep grade to a brook which traversed the length of the lot. The portion of the south lot between the brook and the real property line (i.e., the lot's most southwesterly portion) was marshy. The south lot was zoned light industrial, i.e., for office and laboratory use. In its negotiations with the estate, petitioner attempted to acquire only the north lot in order to assemble it with a contiguous tract, also to the north of Sussex 4 Avenue (the Timberbrook tract), to be acquired contemporaneously from vendors other than the estate. The north lot and the Timberbrook tract together formed a 280-acre tract on which petitioner planned to build a 290-home residential development to be named Butterworth Farms. Subdivision and development of the south lot was not economically feasible because of the lot's size, its noncontiguity with the rest of the tract, its steep terrain and drainage problem, and its nonresidential zoning. However, the estate was fearful of retaining only the south lot, which *207 it thought would be extremely difficult to dispose of as a separate parcel.The estate rejected petitioner's offer to acquire only the north lot and insisted that, if a sale was to take place, it had to include both the north and south lots as a unit. Petitioner purchased the north and south lots in October of 1962 for approximately $158,000. Contemporaneously, petitioner purchased the Timberbrook tract and began developing Butterworth Farms. As part of the development, petitioner entered into an agreement with the Morris Township whereby petitioner would build a sewer plant, to be operated by the Township, in consideration for the Township's not charging petitioner the normal $600 to $800 hookup charge for tying in the homes in Butterworth Farms. 5 The sewer plant was designed to service 300 tie-ins, and petitioner had the rights to all 300. The sewer project cost petitioner around $200,000. By 1966, petitioner had completed building houses on 270 out of the original 290 lots laid out. From 1963 through 1966, petitioner annually reported as gross income from the sales of homes amounts ranging from $1,634,449 up to $3,369,550. Petitioner owned the south lot for approximately *208 4 years. During that period, the lot was not platted, subdivided, or improved in any fashion. Neither was the lot advertised for sale, nor did petitioner receive any offers to buy the lot, other than the single solicitation and offer which let to the lot's sale, described below. In 1965, the Morris Township's appraised value for the lot was $23,600. Philip Azzolina, one of the petitioner's longstanding mortgage customers, was a developer during the period here pertinent, and he enjoyed a reputation as a builder of attractive houses. Sometime around the beginning of 1966, an employee in petitioner's mortgage banking department, who was also a licensed real estate salesman, brought to the attention of Philip J. Bowers II, executive vice president of petitioner in charge of residential development, the fact that Azzolina was in need of additional land for developmental 6 purposes. The employee, who was motivated in part by a desire to earn a commission on any resulting sale, suggested to Bowers that the south lot be joined with a larger, contiguous tract of land also to the south of Sussex Avenue, and that the two parcels be sold together to Azzolina. The owner of the contiguous *209 land was Pafbro Corporation (Pafbro), a New Jersey corporation with its principal office in Morristown, New Jersey. Bowers approved the plan and gave the employee permission to discuss the proposal with Pafbro. Bowers did not believe that the south lot could be sold to Azzolina separate from the land owned by Pafbro. Ultimately, in early 1966, Pafbro and Azzolina agreed to a proposal whereby petitioner would sell the south lot to Pafbro for $80,000, and, subsequently or simultaneously, Pafbro would sell both parcels of land to Azzolina for $315,000. Petitioner was to arrange the mortgage financing for Azzolina, and both sales were made conditional on the occurrence of certain events which would insure Azzolina's success in financing and developing a residential housing project on the land which was the subject of the sale. Specifically, the pertinent terms of the contract for sale of the lot to Pafbro, dated May 6, 1966, are as follows: 7 * * * [Petitioner] agrees to grant and convey to * * * [Pafbro] such rights and privileges as it has or may have under an agreement with the Township of Morris in regard to hook-up or tie-in with the sewage disposal system which *210 now serves Butterworth Farms, * * * * * * [Petitioner] agrees to save * * * [Pafbro] harmless and to indemnify * * * [Pafbro] from the payment of any broker's commission in connection with the sale and purchase of the land hereby agreed to be conveyed. * * * It is understood and agreed by and between the parties hereto that if for any reason Philip Azzolina or his assigns does not perform his contract with Pafbro Corporation because of inability to obtain satisfactory zoning changes or satisfactory sub-division approval for the lands now owned by Pafbro Corporation and the lands hereby agreed to be conveyed, or the inability of * * * [petitioner] to obtain a firm commitment for a land mortgage in the amount of $565,000.00 covering the lands now owned by Pafbro Corporation, as well as the premises hereby agreed to be conveyed, * * * [Pafbro] shall have the option of terminating and rescinding this agreement and obtaining a refund of all monies paid on account of the purchase price, or of completing the purchase of the premises hereby agreed to be conveyed, regardless of whether or not the contract between Pafbro Corporation and Philip Azzolina is performed by him or *211 his assigns. Said option shall be exercised by serving written notice upon * * * [petitioner] on or before November 1, 1966. * * * * * * [Petitioner] agrees to lend such assistance as may be necessary to complete the transaction outlined in the contract between Pafbro Corporation and Philip Azzolina, insofar as that contract provides for certain things to be performed by * * * [petitioner]; it being the intention of the parties hereto that the purpose of 8 this agreement is to accord practical compliance with the representations made in the contract between Pafbro Corporation and Philip Azzolina, insofar as that contract relates to certain things to be performed by * * * [petitioner]. The pertinent terms of the tripartite agreement between petitioner, Pafbro, and Azzolina, dated May 19, 1966, including the contract of sale between Pafbro and Azzolina, are set out below: * * * [Pafbro] agrees to grant and convey to * * * [Azzolina] such rights and privileges as it will acquire from * * * [petitioner] under an agreement between * * * [petitioner] and the Township of Morris in regard to hook-up or tie-in with the sewage disposal system which now serves Butterworth *212 Farms. It is a condition of this contract that either prior to or simultaneously with the transfer of title that portion owned by * * * [petitioner] will be conveyed by * * * [petitioner] to * * * [Pafbro]. * * * [Petitioner] agrees that it will obtain a firm mortgage loan commitment in the amount not less than $610,000.00 and for which * * * [Azzolina] agrees to pay to * * * [petitioner] the sum of $6,100.00. The terms of said mortgage commitment shall be as follows: Interest at the rate of 6 1/2% per annum on the amount advanced; the loan shall be for a period of three years; that not less than $290,000.00 shall be advanced upon the execution of the mortgage by * * * [Azzolina]; that before any advance of mortgage funds is made * * * [Azzolina] shall have obtained preliminary subdivision approval from the Planning Boards of the Townships of Randolph and Morris; that proof of compliance with the conditions under which preliminary approval has been obtained has been submitted to the mortgagee; that advances 9 under the mortgage subsequent to the first advance of $290,000.00 shall be conditioned on the installation of the improvements or posting of performance *213 bonds as required under the preliminary approval; that as individual lots are released from the lien of the mortgage, the mortgagor shall pay two per cent of the amount fixed for the release of each lot as a fee for services in connection with the execution of the release; that the commitment shall provide for individual construction and permanent mortgages, the amounts thereof to be determined upon the plans and specifications submitted for the construction of each house on each lot. * * * * * * [Pafbro] agrees to pay * * * [petitioner] a fee for its services rendered in connection with this sale in the amount of $25,000.00 and does agree to hold harmless and indemnify * * * [Azzolina] from the payment of any commission to any broker. * * * Said premises are to be conveyed subject to existing zoning ordinances, except that it shall be the responsibility of * * * [Pafbro] to obtain a change of zone from office and laboratory to R-2 for the first 1,000 feet south of Sussex Avenue and R-1 for the balance of the property hereby agreed to be conveyed. This sale is contingent upon * * * [Azzolina] securing preliminary subdivision approval from the necessary agencies *214 of the Townships of Randolph and Morris. If said subdivision approval is not secured, then this contract shall be null and void and all deposit monies shall be returned to * * * [Azzolina]. * * * * * * [Petitioner] agrees to lend such assistance as may be necessary to enable * * * [Azzolina] to file such improvement bonds as may be required 10 by the municipalities. * * * [Pafbro] represents that all of the lands hereby agreed to be conveyed are sewerable into the existing sewer system of the Township of Morris. * * * [Azzolina] agrees that all expenses incident to the applications for subdivisions of the property shall be paid by him and does further agree to proceed immediately with his engineering and surveying studies and plans for early submission to the Morris and Randolph Township Planning Boards. Both of the sales were closed simultaneously. Although the marshy area of the lot was unsuitable for housing, Azzolina was attacted to the idea of purchasing the lot because his residential development plans necessitated a zoning change which he thought would be expedited by a donation of the marshy area to the Morris Township as a public park. This was *215 in fact done, and subsequently a retaining basin was constructed to mitigate the drainage problem on the lot. Although Azzolina eventually platted the combined lots, paved the streets, and began building houses, his development plans were frustrated financially by a delay caused by three or four suits brought to contest the subdivision platting and zoning changes. Pursuant to the tripartite agreement, petitioner shared the cost of disposing of these suits. In the 6-year period between the sale of the lot and 11 the time of the trial in this case, only one house had been built on the lot and ground had not been broken for the construction of any other houses. In its 1966 income tax return, petitioner allocated a $40,000 basis to the lot and reported long-term capital gain of $40,000 on the sale to Pafbro. In the notice of deficiency, respondent has not challenged the basis allocation but has characterized the gain has ordinary income. ULTIMATE FINDING OF FACT The south lot was not held primarily for sale to customers in the ordinary course of petitioner's business at the time of the lot's sale in 1966. OPINION Petitioner will be accorded favorable capital gains *216 treatment on the income realized from the sale of the lot to Pafbro if the lot was a capital asset at the time of the sale. Sec. 1222 (3). Section 1221 defines a capital asset to mean "property held by the taxpayer (whether or not connected with his trade or business)," but excludes from this broad definition "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business," sec. 1221(1). By written agreement 12 of the parties, [2] the sole issue for decision is whether the lot was property of the kind described in section 1221(1). When petitioner purchased the 116-acre tract from the estate, we think it was acting as both a dealer and investor in real estate. See Charles E. Mieg, 32 T.C. 1314, 1321 (1959) (and cases cited therein), acq. 1960-2 C.B. 6. There is no doubt that the land north of Sussex Avenue was purchased for the purpose of having it subdivided, built upon, and sold to customers in the ordinary course of petitioner's business as a residential housing developer. However, that petitioner is, concededly, a real estate dealer and broker in some of its activities does not preclude its being an *217 investor in relation to others, including the holding of the south lot. See, e.g., Yara Engineering Corp. v. Commissioner, 344 F. 2d 13 113 (C.A. 3, 1965), affirming per curiam a Memorandum Opinion of this Court, and Scheuber v. Commissioner, 371 F.2d 996, 999 (C.A. 7, 1967). See also Eline Realty Co., 35 T.C. 1 (1960), acq. 1961-1 C.B. 4; Charles E. Mieg, supra; and Walter R. Crabtree, 20 T.C. 841, 848 (1953). Where individual pieces of real estate held by a dealer can be easily identified, [3] the problem becomes one *218 of characterizing the particular parcel of land as one held primarily for sale or as an investment. See, e.g., Eline Realty Co., supra at 5. The issue is a factual one, and the objective facts are especially significant. In Kaltreider v. Commissioner, 255 F.2d 833, 838 (C.A. 3, 1958), the Court of Appeals sets forth the following principles for resolving that issue: "There is no fixed formula or rule of thumb" for determining whether property is held primarily for sale to customers in the ordinary course of the taxpayer's business and "Each case must, in the last analysis, rest upon its own facts." 11 No single factor or test is dispositive. 12 Factors considered are: (1) the purpose for which the property was acquired; (2) the purpose for which it was held; (3) improvements, and their extent, made to the property by taxpayer; (4) frequency, number and continuity of sales; (5) the extent 14 and substantiality of the transactions; (6) the nature and extent of taxpayer's business; (7) the extent of advertising to promote sales, or the lack of such advertising; and (8) listing of the property for sale directly or through brokers. 13 [Footnotes omitted. *219 ) Petitioner attempted, in 1962, to purchase only the north lot from the estate because it was not economically feasible to include the isolated, industrially zoned, steeply graded, and marshy area south of Sussex Avenue in the development plans for Butterworth Farms.However, because the estate insisted on selling the two lots as a unit, petitioner acquired both of them. The objective facts show that the south lot was not acquired primarily for resale to customers of petitioner's business. Aside from the sale in issue, petitioner had never bought and sold unimproved real estate for its own account. In contract with the substantial development and vigorous selling activity in relation to the property north of Sussex Avenue, petitioner merely retained ownership of the lot for 4 years without subdividing it or making any improvements on it. The lot was never advertised or publicly offered for sale. Prior to the Azzolina transaction, no effort of any kind was made to sell the lot. Nor did petitioner formulate any plans for developing it so that it could be *220 resold. 15 These facts demonstrate that, at least up until 1966, the lot was not held primarily for sale to customers. Malat v. Riddell, 383 U.S. 569, 572 (1966). The question thus arises as to whether petitioner's activities following the decision to attempt to arrange the Pafbro-Azzolina deal changed petitioner's relationship to the property in such a way as to cause it to be characterized as property held primarily for sale to customers in the ordinary course of petitioner's business. See, e.g., Heebner v. Commissioner, 280 F.2d 228 (C.A. 3, 1960), certiorari denied 364 U.S. 921 (1960). In the early part of 1966, an employee of petitioner conceived of a plan whereby Pafbro and petitioner would consolidate their contiguous properties in order to make an attractive proposal to developer Azzolina. Petitioner thought that only in this way would the lot be made salable. To induce Pafbro and Azzolina to agree with the proposal, petitioner offered to convey to Azzolina certain rights to tie-ins to the sewage disposal system then serving Butterworth Farms and to perform certain services intended to insure Azzolina's successful development *221 of the larger tract, namely: (1) to obtain a firm commitment for a land 16 mortgage of $610,000 [4] in Azzolina's favor, for which petitioner was to be paid $6,100; (2) to assist Azzolina in obtaining a satisfactory zoning change or satisfactory subdivision approval for the transferred lands; and (3) to assist Azzolina in filing the necessary improvement or performance bonds. In consummating the sale of the lot to Pafbro and the subsequent sale to Azzolina, it is true petitioner acted also as a broker. Indeed, Pafbro paid petitioner a $25,000 fee for its services, and that fee is taxable as ordinary income. But we do not think, in the context of the issue tried by the parties, those services taint the gain realized on the sale of the south lot to Pafbro. Petitioner thought it could not profitably sell the lot alone. By tying it in with the Pafbro property and arraning the sale of the larger property to Azzolina, petitioner merely used its business resources to assist in liquidating its investment in the lot. *222 We do not think the steps taken to make the deal acceptable to Azzolina caused petitioner to 17 assume the mantle of a dealer in relation to the south lot. See Wellesley A. Ayling, 32 T.C. 704, 708-709 (1959), acq. 1959-2 C.B. 3; W. T. Thrift, Sr., 15 T.C. 366, 371 (1950), acq. 1951-1 C.B. 3. To support his theory that the gain was the fruit of petitioner's brokerage activities rather than the lots' appreciation in value, respondent cites a Morris Township appraisal of the lot in 1965 at $23,600 and some rather cryptic testimony that residential property in the area was selling for $900 to $1,00 per acre during this period. From this evidence, respondent asks us to conclude that the Pafbro-Azzolina transaction was merely a transaction in the ordinary course of petitioner's business which produced gain attributable primarily to land brokerage activities. However, respondent's factual premise is too weak to support his argument. A local government tax appraisal, such as that of Morris Township, is a notoriously unreliable guide to real estate values. See Helen D. Emmet, 11 T.C. 90, 95 (1948), and Helen Barclay, Executrix, 4 B.T.A. 1139, 1141 (1926). *223 And we are not satisfied that residential property in the area in 1966 was selling at the prices cited by respondent. Indeed, prior to the extensive 18 development of the area, petitioner in 1962 paid the Butterworth Estate over $1.350 per acre for the entire 116 acres, and by 1966, according to the testimony, it "was becoming increasingly difficult to get land" as close to town as this property. We think it apparent that the lot appreciated in value during the period petitioner owned it. Moreover, the fact that petitioner was able to liquidate its investment in the lot by arranging the two-step Pafbro-Azzolina transaction does not establish that the character of petitioner's holding of the lot changed. As we understand the substance of respondent's argument in this respect, it is directed toward showing that a portion of the $80,000 represents a disguised compensation for petitioner's brokerage services, taxable under section 61(a) (1). The essence of that argument is that the transaction was in part a sham, i.e., that the sale price of the lot to Pafbro was not bona fide, determined from arm's-length negotiations, but was in part compensation for brokerage services. That *224 argument raises issues and calls for evidence different from the issue stipulated by the parties. See footnote 2, supra. Respondent having determined that the lot was not property of the character described in section 1221(1), we think it would be unfair to petitioner to 19 decide the case on other grounds, especially since the value of the lot immediately prior to the Pafbro-Azzolina deal was never placed in issue or established by credible evidence. We think the preponderance of the evidence supports our Ultimate Finding that the lot was not held primarily for sale to customers in the ordinary course of petitioner's business at the time of the sale in 1966. Decision will be entered under Rule 50. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue. ↩
2. The stipulation of facts contains the following paragraph: The sole issue in this case is whether the Lot was held by the Petitioner primarily for sale to customers in the ordinary course of the Petitioner's business within the meaning of Section 1221 of the Internal Revenue Code of 1954↩, as amended, as contended by the Commissioner, or whether the net amount realized of $40,000 by the Petitioner from the sale of the Lot arose from the sale of a capital asset under the same Section of the Internal Revenue Code of 1954, as amended, as contended by the Petitioner. 3. See sec. 1236 for a statutory resolution to the identification problem posed by dealers in stocks and securities. ↩
4. In the contract bewteen petitioner and Pafbro, the agreed figure for the land mortgage is $565,000 but no explanation of the discrepancy appears in the record. ↩