Meridian, Inc. v. Commissioner.
Meridian, Inc. v. Commissioner
Docket No. 85158.
United States Tax Court
T.C. Memo 1962-59; 1962 Tax Ct. Memo LEXIS 249; 21 T.C.M. (CCH) 321; T.C.M. (RIA) 62059; March 20, 1962
*249 1. Capital gain v. ordinary income: Property held primarily for sale: Lease with option to purchase. - Petitioner pursuant to a lease agreement erected a building according to the plans and specifications of the lessee. The lease which was for a term of 21 years included a provision which granted the lessee an option to purchase the property at the end of the fifth year of the lease. The lessee exercised its option and purchased the property. Held: The property was held primarily for sale to customers in the ordinary course of business and the gain realized on the sale was ordinary income. 2. Interest paid: Amortization of loan premium. - Held: Petitioner is entitled to a deduction for loan premium amortization and a deduction for interest expense for the years 1954 and 1955. James E. Mitchell, Esq., 708 Union National Bank Bldg., Youngstown, Ohio, for the petitioner. Buckley D. Sowards, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined deficiencies in income taxes in the amounts of $33,899.56 and $1,573.02 for the years 1954 and 1955, respectively. The issues are: (1) whether the gain realized on the sale of a building in 1954 should be treated as capital gain or ordinary income; (2) whether petitioner is entitled to a deduction for loan premium amortization for 1954 and 1955, and whether petitioner is entitled to a deduction for interest expense for 1954 and 1955. Issue I Findings of Fact Some of the facts have been stipulated and are incorporated herein by reference. Petitioner, a corporation organized on April 26, 1948 and existing under the laws of the State of Ohio, has *251 its office in Youngstown, Ohio. Petitioner filed its returns for the years at issue with the director of internal revenue at Cleveland, Ohio. The M. DeBartolo Construction Company, successor to a partnership of the same name, was incorporated December 14, 1944, for the purpose of constructing roads, sewers, buildings and owning and operating real estate with the following shareholders: Edward J. DeBartolo
266 shares
Michael DeBartolo
266 shares
Francis DeBartolo
144 shares
James DeBartolo
144 shares In September 1947, Michael DeBartolo made the following gifts: Francis DeBartolo
76 shares
James DeBartolo
76 shares In July 1948, Francis DeBartolo sold to: Edward J. DeBartolo
114 shares
James DeBartolo
76 shares On April 21, 1951, the corporation redeemed the stock held by James DeBartolo
266 shares On July 14, 1955, the corporation redeemed the stock held by Michael DeBartolo
114 shares leaving Edward J. DeBartolo the sole shareholder. The DeBartolo family, the father and two sons, was approached by the Whitmer-Jackson Company of Cleveland, which wanted to establish a warehouse and a small *252 office and manufacturing plant in the Youngstown vicinity. To carry out this project and similar projects, the DeBartoloes decided to form a separate corporation that would first negotiate a lease for commercial or warehouse property for a term of years, usually 15 with a tenant having a good financial rating. After an agreement had been formulated, the corporation would secure a building site and finance the construction by means of a long-term mortgage. Under an agreement with the new corporation, the M. DeBartolo Construction Company would then erect the building at cost according to plans and specifications provided by the corporation and the tenant. In accordance with this plan petitioner was formed in 1948. The purpose clause in its corporate charter stated: THIRD. The purpose or purposes for which it is formed are: In furtherance and not in limitation of the general powers conferred by the laws of the State of Ohio and the objects and purposes herein set forth, it is expressly provided that this Corporation shall also have the following powers, to-wit: To purchase, acquire, hold, convey, lease, mortgage, or dispose of property, real or personal, tangible or intangible; *253 To borrow money and issue, sell or pledge bonds, promissory notes and other evidences of indebtedness; To acquire the good will, rights and property, and to undertake the whole or any part of the assets or liabilities of any persons, firm, business, association, or corporation, and to pay for the same in cash or in stock of this Company, or otherwise; to operate and manage said business or property and to sell or otherwise dispose of the whole or any part of said property and to exercise all powers necessary or convenient in and about the conduct and management of said business. To act as Agent or representative of individuals, firms or corporations and as such to manage, develop and extend real estate or other business interests of such persons; To carry on any other business which the Company, by action of its Board of Directors, may deem convenient or which may render profitable any of said Company's property or rights, excepting however, that this Corporation shall not engage in the manufacture or sale of plastics or any plastic products. The original shareholders of the petitioner were: Edward J. DeBartolo
70 shares
James T. DeBartolo
49 shares
Michael DeBartolo
21 shares
*254 Petitioner acquired James T. DeBartolo's 49 shares on April 23, 1952 and Michael DeBartolo's 21 shares on July 14, 1955, leaving Edward J. DeBartolo to sole shareholder from July 14, 1955, to date. The various transactions in which petitioner has participated from the time of its formation to date are as follows: On August 28, 1948, petitioner entered into a lease with Whitmer-Jackson. This lease was for a term of 15 years, commencing on or about January 1, 1949, at a yearly rental of $15,926.04. Included in the lease was the following provision: The Lessee herein is given the exclusive right and option of purchasing the leased premises any time up to and including the tenth (10th) year of this Lease at the original cost of the land and building, being the sum of ONE HUNDRED SEVENTY-SIX THOUSAND NINE HUNDRED FIFTY-SIX AND NO/100 DOLLARS ($176,956.00); however, should this option be exercised and the Lessee elect to purchase said leased premises, there will be credited on the above purchase price an amount equal to two per cent (2%) per year of the total cost of the land and building, to be applied against the original cost of the land and building. This option may be exercised *255 at any lease year and by giving notice not less than ninety (90) days prior to the end of any lease year up to and including said tenth (10th) year, by registered mail, to the Lessor at the above address. On January 31, 1949, petitioner and Whitmer-Jackson entered into an agreement modifying the lease under date of August 28, 1948. This agreement provided that the yearly rental would be $16,156.53 and the actual cost of the land, building and other structures was $179,517 which would be the purchase price of the property under the option in the lease of August 28, 1948. On April 28, 1953, petitioner and Whitmer-Jackson entered into a 15-year lease commencing on July 1, 1953, at a yearly rental of $29,766.53. This lease included the premises described in the August 28, 1948 lease, as well as a new building to be erected for Whitmer-Jackson by petitioner. Under this lease the lessee had the option to purchase at any time up to July 1, 1959 for $315,617. The buildings erected by petitioner were built in accordance with specifications approved by the parties. Whitmer-Jackson exercised its option to purchase on July 1, 1960. On October 12, 1948, petitioner entered into a lease *256 with the Ohio Machinery Company for a term of 15 years. This lease provided: The Lessee shall pay to the Lessor as rent for the said demised premises a sum equal to nine percent (9%) per year of the complete cost of construction of said building plus twelve percent (12%) overhead and profit fee to be added to the cost of the construction of the building and plus cost of the land. The Lessor covenants and agrees as a condition of this Lease, at its sole cost and expense, to erect on or before March 1, 1949, on said demised premises, a building according to the plans and specifications, dated August 2, 1948, and revised August 10, 1948, which have been approved by both parties. Said building will be erected at a cost plus overhead and profit fee of twelve percent (12%) and said cost plus profit fee of twelve (12%) percent, plus land, will in no event exceed the sum of ONE HUNDRED FIFTY-THREE THOUSAND AND NO/100 DOLLARS ($153,000.00). Any savings that may accrue in actual cost will be credited back against the above guaranteed maximum price. Any increase in cost due to changes made hereafter in the plans, specifications or materials, which said changes must be approved in writing *257 by both parties, will be added to said guaranteed price plus twelve percent (12%) profit fee. Detailed statements for materials, labor, etc., will be available at the office of the Lessor for inspection at the option of the Lessee. The Lessee herein is given the exclusive right and option of purchasing the leased premises any time up to and including the tenth (10th) year of this Lease at the original cost of the building plus profit fee of twelve percent (12%) and land; however, should this option be exercised and the Lessee elect to purchase said leased premises, there will be credited on the above purchase price an amount equal to two percent (2%) per year of the total cost of the leased premises as above set forth, said credit to be applied against the original cost of the leased premises. This option may be exercised in any lease year and by giving notice not less than ninety (90) days prior to the end of any lease year up to and including said tenth (10th) year, by registered mail, to the Lessor at the above address. The lessee also covenanted to pay all real estate taxes and insurance expenses with respect to the property as well as all expenses for the normal upkeep of *258 the leased property. A supplemental lease dated July 6, 1949, between petitioner and Ohio Machinery set the yearly rental at $14,139.15 and the purchase price at $157,101.73. Ohio Machinery exercised its option to purchase the leased property on December 17, 1952. In May 1949 petitioner entered into an agreement with The Seven-Up Bottling Company in which petitioner was to erect a building for Seven-Up according to specifications and plans approved by both parties at a cost of $72,000, including land. Seven-Up could either purchase or lease the building when completed, such election to be made within ten days of the notification of completion of the building. If Seven-Up elected to purchase, the price was to be $72,000 and if it elected to lease, the lease would be for a term of 15 years at an annual rental of $6,480. In addition Seven-Up had the privilege of purchasing at any time during the term of the lease for $72,000. On August 19, 1949, Seven-Up exercised the option to purchase. Petitioner under a provision in their prior agreement took a piece of property owned by Seven-Up on Wick Avenue as a partial payment of $32,500 on the purchase price. The Wick Avenue property *259 was subsequently sold by petitioner in 1957. On July 28, 1949, petitioner entered into a lease with the Century Food Markets Company. The lease provided that petitioner would erect a building in accordance with the revised plans and specifications of an architect obtained by Century Food. The term of the lease was 21 years with rental payments as follows: First 6 years
$37,200 per annum
Next 5 years
$36,000 per annum
Next 5 years
$34,800 per annum
Next 5 years
$29,000 per annum
Included in the lease were the following provisions: The price for the construction of the building above mentioned is THREE HUNDRED AND EIGHTY FIVE THOUSAND DOLLARS ($385,000.00), which price includes land valued at SEVENTEEN THOUSAND AND FIVE HUNDRED DOLLARS ($17,500.00), the architects fee based at 4% of our estimate of the cost of the job, and also includes allowance of FIFTEEN THOUSAND DOLLARS ($15,000.00) for electrical wiring and lighting fixtures. * * *
The Lessee is hereby given the option, providing this lease is in full force and effect and all rent payments are made when due, to purchase the leased premises at the end of the first FIVE (5) YEARS of the lease *260 term that is, on January 1, 1955, at the original contract price of THREE HUNDRED EIGHTY-FIVE THOUSAND DOLLARS ($385,000.00) less a credit of TEN PERCENT (10%), making the purchase price THREE HUNDRED FORTY-SIX THOUSAND FIVE HUNDRED DOLLARS ($346,500.00). * * *
Should the Lessee fail to exercise its option to purchase on January 1, 1955, then and in that event, the Lessor may sell these leased premises on the open market at the best price obtainable. On April 22, 1950, petitioner and Century Food entered into an agreement modifying the lease of July 28, 1949. This agreement increased the purchase price from $346,000 to $347,625. Century Food exercised the option to purchase on December 28, 1954. On November 16, 1949, petitioner and Paul M. Fithian entered into an agreement in which petitioner agreed to construct a building on land in accordance with plans and specifications prepared by petitioner. Fithian agreed to lease the property for a period of one year, or not less than six months at a rental which would equal 9 percent of the cost of land and building. Fithian was to purchase the premises at the conclusion of the lease. The purchase price was to be the cost of labor *261 and materials plus 15 percent for overhead and profit. Fithian purchased the property in September 1950. On April 26, 1960, petitioner and City Products Corporation entered into an agreement in which it was agreed that petitioner would erect a building to be leased by City Products for a term of 25 years. This agreement did not contain an option to purchase. On April 17, 1961, petitioner entered into an agreement with American Elumin Company. Under the terms of this agreement petitioner was to construct a building to be leased to American Elumin for 20 years. This agreement did not include an option to purchase. Petitioner and Lustro Plastic Tile Co., Inc. entered into an agreement on May 26, 1961 in which it was agreed that petitioner would erect a building to be leased to Lustro for a term of 20 years. An option to purchase the leased property was granted to the Home Ave. Corp. on May 29, 1961. This option provided: This option shall be exercisable only after the expiration of the fifth year of the term of the aforesaid lease agreement and shall expire upon the termination of said lease agreement whether by lapse of time, default of Tenant or otherwise. * * * *262 The purchase price is Three Hundred Seventy Thousand Dollars ($370,000) less an amount equal to two per cent (2%) of said sum for each full year elapsing between the commencement of the aforesaid lease term and the date of purchase plus an amount equal to the undersigned's cost of constructing any additional buildings or improvements upon the premises after the commencement of the lease term, (which costs are determined in accordance with the formula set forth in said lease agreement) less an amount equal to two per cent (2%) of such costs for the additional buildings or improvements for each year between the completion of such additional buildings and improvements and the date of purchase of the premises. * * *
The Commissioner determined the gain on the sale of the leased premises to Century Food in 1954 which petitioner reported as a capital gain should have been reported as ordinary income. Ultimate Finding The profit on the sale of the property to Century Food was derived from property held by petitioner primarily for sale to customers in the ordinary course of its trade or business and is taxable as ordinary income. Opinion The Commissioner's determination that *263 the gain on the sale of the leased property to the lessee, Century Food, was not capital gain as reported by petitioner, but was ordinary income, presents the question whether the property was held by petitioner primarily for sale to customers in the ordinary course of business. The question is one of fact to be resolved with a view to all the attendant facts and circumstances. Although the Commissioner's determination is confined to the sale to Century Food, we have recited in our findings the other transactions in which petitioner has been involved, in order to place the transaction with Century Food in the context of petitioner's entire operation. As set forth in the findings, Seven-Up under the terms of its agreement with petitioner could either purchase or lease the building upon completion. Although Seven-Up did lease, it exercised an option to purchase which had been granted to it within four months. Similarly, the agreement with Paul M. Fithian provided that Fithian would lease the property for a period of one year, or not less than six months. Fithian was to purchase the premises at the conclusion of the lease and he did purchase the property within a year of the execution *264 of the agreement. Both the Whitmer-Jackson and the Ohio Machinery leases contained a provision in which the lessee was given "the exclusive right and option of purchasing the leased premises any time up to and including the tenth year of [the] lease." Whitmer-Jackson and Ohio Machinery each exercised its respective option to purchase. In the agreement with Century Food, petitioner granted Century Food an option to purchase at the end of the first five years of the lease. Century Food purchased the leased premises at the end of the fifth year, which sale gave rise to the instant controversy. It is apparent from a review of the transactions that each lease negotiated by petitioner in the first two years of its existence contained an option to purchase, which option was subsequently exercised by the lessee. And as pointed out by the Commissioner it was not until after the statutory notice of deficiency in this case had been issued that straight lease agreements were executed. The options granted by petitioner were in effect offers to sell. Joseph A. Harrah, 30 T.C. 1236 (1958). And so far as we can see, petitioner held the property for the dual purpose of lease *265 or sale. In Rollingwood Corp. v. Commissioner, 190 F. 2d 263, 266 (C.A. 9, 1951) the court noted that: The capital gains provisions are remedial provisions. Congress intended to alleviate the burden on a taxpayer whose property has increased in value over a long period of time from having the profits from sales taxed at graduated tax rates designed for a single year's income. The purpose is to protect "investment property" as distinguished from "stock in trade," or property bought and sold for a profit. It is our view that this policy was not meant to apply to a situation where one of the essential purposes in holding the property is sale. Inasmuch as "one of the essential purposes in holding the property" in the instant case was for sale, it follows that the sale to Century Food was not a capital transaction as reported by petitioner. And see Ge rge K. Heebner, Jr, . 32 T.C. 1162 (1959), affd. 280 F. 2d 228 (C.A. 3, 1960), where we held that the profit on sale by a "package" builder of a building constructed to meet the needs of a particular customer was taxable as ordinary income. Issue II Findings of Fact Some of the facts *266 have been stipulated and are so found. On September 20, 1954, petitioner, along with Edward J. DeBartolo and his wife Marie, and seven other companies of which Edward J. DeBartolo was president, borrowed $875,000 from Nathan Schulman and executed various notes evidencing this indebtedness. The loan was to bear interest at 6 percent and was to be repaid in 37 monthly installments. The note was to be secured by a mortgage on all of petitioner's properties and the properties of the other signers. Petitioner was jointly and severally liable to Schulman for the entire amount of $875,000. The loan included a premium of $175,000 leaving $700,000 as the net proceeds. Petitioner received $20,000 of the net proceeds which it made available to the M. DeBartolo Construction Company without interest. Petitioner paid $641.73 in 1954 and $5,425 in 1955 as its share of the interest and loan discounts and claimed deductions for such payments. The payments were made to the M. DeBartolo Construction Company which accumulated all the payments and issued one check to Schulman. The Commissioner determined that the amounts of $270.20 and $4,729.80 deducted for amortization of loan costs in 1954 *267 and 1955, respectively, were not allowable deductions for such years within the meaning of section 162, Internal Revenue Code of 1954. The Commissioner also determined that the amounts of $371.53 and $695.20 deducted as interest for 1954 and 1955, respectively, were not allowable deductions for such years within the meaning of section 163, Internal Revenue Code of 1954. Opinion As set forth in our findings, the lender deducted $175,000 from the $875,000 loan as a premium. And in the years 1954 and 1955 petitioner claimed a deduction for the amortized premium cost. The issue here is framed by the Commissioner's determination that petitioner is not entitled to such a deduction. He claims that in order to amortize the premium payment which he refers to as loan cost, it is necessary to meet the requirements of section 162(a), Internal Revenue Code of 1954, i.e. an ordinary and necessary business expense. With respect to the instant case, he argues that since the proceeds were made available free of interest charges to another corporation controlled by petitioner's shareholders, the expense was completely unrelated *268 to petitioner's business activities and accordingly was not an ordinary and necessary expense of its trade or business. A similar factual situation existed in L-R Heat Treating Co., 28 T.C. 894, 896 (1957) where the taxpayer borrowed money on several occasions and in addition to a 6 percent interest charge, the lender deducted certain sums from the total loan as a premium for making the loan. In characterizing the premium for income tax purposes this Court said: Interest has been defined as an "amount which one has contracted to pay for the use of borrowed money," Old Colony R. Co. v. Commissioner, 284 U.S. 552; or "compensation for the use or forbearance of money," Deputy v. DuPont, 308 U.S. 488. These cases pointed out that Congress intended that the word be accorded the usual, ordinary, and everyday meaning in the affairs of business. We had almost identical facts before us concerning one of the issues in Court Holding Co., 2 T.C. 531, reversed on another issue 143 F. 2d 823, reversed 324 U.S. 331. The *269 issue about which we are interested was not the subject of appeal. There the taxpayer executed and delivered three notes to one Regina Feiwish as evidence of a cash loan made by her to the taxpayer. The notes were in the total sum of $3,000 and upon receipt of the proceeds of the loan, the taxpayer paid a cash bonus of $350 to Regina Feiwish in consideration of her making the loan. We held (2 T.C. at 536): In our opinion the amount in question constituted interest paid on an indebtedness of the petitioner, and is deductible. It is true that the promissory notes representing the Feiwish loan were made by Louis Miller, individually, but it is not disputed that the loan was made to the petitioner or that it was repaid by the petitioner. That payment of the indebtedness of another was made by the petitioner as a volunteer can not be assumed. The evidence shows also that the $350 was paid as compensation for the use of borrowed money, although denominated as rent discount. It falls within the ordinary and accepted definition of "interest," and it is in the ordinary and accepted sense that that term is used in the revenue acts. Old Colony Railroad Co. v. Commissioner, 284 U.S. 552. *270 The instant case is ruled by our holding above. Here it is admitted there was a negotiated bonus or premium to be paid the lender as a prerequisite to obtaining borrowed capital. The fact that here the amount of the bonus or premium was withheld by the lender, and in the above-cited case the bonus was paid back to the lender, is immaterial. Petitioner's counsel admits the withholding was done here "instead of exchanging checks." The fact that the parties did not call the premium or bonus interest and that the petitioner did not treat the bonus or premium on its books as interest is likewise immaterial. See also John Randolph Hopkins, 15 T.C. 160 (1950). In Arcade Realty Co., 35 T.C. 256, 262 (1960), this Court pointed out that the statute, section 163(a), "does not require that interest, to be deductible, must be an ordinary and necessary business expense." See L. Lee Stanton, 34 T.C. 1 (1960). And in view of our holding in L-R Heat Treating Co. that a premium or bonus is considered to be interest, it follows that the Commissioner's determination was erroneous. The Commissioner has also determined that petitioner is not entitled to *271 an interest deduction under section 163(a), I.R.C. 1954 for the years 1954 and 1955. The Commissioner claims that the transaction was a sham inasmuch as there is no evidence to show that the $20,000 was paid over to petitioner or deposited in its bank account. And he says that the transaction in substance was that Edward J. DeBartolo needed capital and chose this sham because of the resulting tax savings. He concludes that the indebtedness incurred by petitioner does not fall within the spirit of section 163(a) since it was not a genuine indebtedness of the taxpayer. The parties have stipulated that petitioner was jointly and severally liable on the note which was secured by a mortgage on the properties of petitioner. And an examination of the note reveals that petitioner was a primary obligor. It was also stipulated that petitioner received $20,000 of the net proceeds which it made available to the M. DeBartolo Construction Company and that petitioner paid $641.73 and $5,425 for the years 1954 and 1955, respectively, as interest and loan premium costs. As we view it, the evidence reveals that petitioner made payments as interest on a genuine indebtedness *272 for which it was primarily liable. The facts do not substantiate the Commissioner's contention that the transaction was a sham. Accordingly, we hold that petitioner is entitled to the interest deduction. Arcade Realty Co., supra.
Decision will be entered under Rule 50.